## A07A0219. AYERS v. THE STATE.
(650 SE2d 370)

RUFFIN, Judge.

Odis David Ayers was charged with the following counts against eight different victims: two counts of kidnapping; two counts of aggravated child molestation; two counts of aggravated sodomy; eight counts of child molestation; two counts of enticing a child for indecent purposes; six counts of false imprisonment; and one count of furnishing harmful material to a minor. Following a trial, the jury found Ayers guilty of the following counts against four of the victims: two counts of kidnapping; three counts of child molestation; two counts of enticing a child for indecent purposes; and two counts of false imprisonment. The jury found him not guilty of the remaining 14 charges. On appeal, Ayers challenges the sufficiency of the evidence and alleges that the trial court erred by refusing to allow both defense attorneys to present closing argument, in failing to permit certain witnesses to testify, by admitting certain evidence, and in charging the jury. He further contends that he received ineffective assistance of counsel. Although we find the evidence sufficient, we agree with Ayers that the trial court erred in denying his request to have two attorneys present closing argument on his behalf and reverse.[1]

1. In reviewing Ayers's challenge to the sufficiency of the evidence, we construe the evidence and all inferences drawn therefrom in a light most favorable to the verdict to determine if a rational trier of fact could have found Ayers guilty beyond a reasonable doubt.[2] So viewed, the evidence shows that Ayers was married and had two sons and four foster children. Ayers also coached a baseball team and was a Cub Scout leader.

M. S., who was nine years old at the time of trial, played on a baseball team that Ayers coached. On one occasion, Ayers played a

---

[1] Double jeopardy principles prohibit retrial of a defendant when the State fails to present sufficient evidence of the crimes alleged. See *Priest v. State*, 265 Ga. 399 (1) (456 SE2d 503) (1995). Thus, although we reverse the convictions from the first trial on other grounds, we nonetheless address his challenge to the sufficiency of the evidence. See *Melton v. State*, 282 Ga. App. 685, 689 (2) (639 SE2d 411) (2006); *In the Interest of J. C.*, 257 Ga. App. 657, n. 1 (572 SE2d 21) (2002).

[2] See *Shorter v. State*, 271 Ga. App. 528 (1) (610 SE2d 162) (2005).

"tickling game" with M. S. while in Ayers's bedroom. According to M. S., Ayers wrapped a rope around him and tickled him, "mostly under [his] arms." Ayers's sons were in the room at the time of the incident. At one point, Ayers put M. S., who was still tied up, in the closet when Ayers heard his wife, Sharon, approaching; when Ayers took M. S. out of the closet a few seconds later, Sharon was gone.

C. C., who was 12 years old at the time of the trial, was friends with one of Ayers's sons. Sometime around July 4, 2002, C. C.'s mother left C. C. at Ayers's house; Ayers was the only person at home. Ayers used rope to tie C. C.'s hands and feet together behind his back, and put tape over C. C.'s eyes and mouth. C. C. testified that there was a video camera pointed toward the area where Ayers tied him up, and C. C. told the police that he saw "an image on [Ayers's] computer of somebody tied up." Ayers also touched C. C.'s "privates" over his clothes. C. C. tried to tell Ayers to stop, but was unable to do so because his mouth was taped. Ayers untied C. C., "wrestled" with him, and then took him home.

B. Z., who was eight at the time of trial, was also friends with one of Ayers's sons. In July 2002, Ayers called B. Z.'s mother and invited B. Z. to come to his house to play with his sons. B. Z.'s mother agreed, and Ayers went to B. Z.'s house to get him. Ayers, who was alone, explained that he was going to get his sons from day care and then take the children to his house to play. Instead, Ayers took B. Z. to Ayers's house, where no one else was present. He tied B. Z.'s hands and feet behind his back, put tape on his eyes and mouth, and tickled him. After Ayers removed the tape from B. Z.'s mouth, B. Z. told Ayers to stop tickling him, and Ayers agreed to give B. Z. pudding instead. Ayers fed the pudding to him, although B. Z. asked him not to. B. Z. could not see what Ayers was using to feed him because his eyes were still taped closed, but he described the object as "smooth" and "hard" and told the police that he thought it was Ayers's finger. B. Z. testified that Ayers inserted the object into his mouth approximately seven times and tickled him more forcefully, despite B. Z.'s demands that he stop.

B. P., who was ten years old at the time of trial, also played on the baseball team that Ayers coached. Ayers called B. P.'s father and asked if B. P. could come to his house to play with one of his foster children. Ayers, who was alone, got B. P. and took him to Ayers's house, where no one else was present. Ayers used a rope to tie B. P.'s hands and feet behind his back and put duct tape over B. P.'s eyes. Ayers then retrieved pudding from the refrigerator and fed it to B. P. with a spoon. B. P. thought he "heard a zipper," and then felt another object touch his lips. Although he was unable to describe the object, B. P. stated that it was not a spoon.

The Georgia Bureau of Investigation ("GBI") investigated the allegations against Ayers. Authorities obtained a search warrant for Ayers's residence. When GBI agents arrived at Ayers's home, he consented to the search. After he was advised of his *Miranda* rights, Ayers agreed to speak to the authorities. Ayers told authorities that he "hog-tied" B. Z. with rope and tickled him for several minutes. Ayers admitted that he took B. P. to his home, where no one else was present, and fed pudding to him; he claimed that after he retrieved his son and foster son, he brought the three children to his home, tied them, and tickled them. He also admitted that while they were alone in his house, he tied C. C. in a hog-tie position — with his hands and feet behind his back — and tickled him on his sides and arms.

During their search of Ayers's residence, the GBI found rope, duct tape, pudding, a belt, and an empty pudding container. The GBI also seized a computer from Ayers's house. At trial, a forensic computer specialist for the GBI testified that there were over 1,300 images on the computer obtained from Ayers's residence. Over Ayers's objection, the trial court admitted several exhibits containing images from sexually explicit web sites that were accessed from the computer taken from Ayers's home. The exhibits contained multiple images involving bondage, in which individuals, both male and female, were tied in various positions with rope. Many of the individuals' mouths were gagged or covered.

Ayers testified at trial, admitting that he tickled and/or wrestled with B. P., C. C., and B. Z. He denied that he restrained C. C. or that he used rope to tie B. P., but stated that he did wrap a belt around B. P. Ayers characterized his actions as "wrestling" and "horseplay," and specifically denied that his actions were intended to arouse his sexual desires or that of the children.

(a) *Child Molestation*

The jury found Ayers guilty of child molestation against B. P., B. Z., and C. C. In Georgia, a person who "does any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person" is guilty of child molestation.[3] Here, C. C.'s testimony that Ayers touched his "privates" is sufficient to authorize Ayers's child molestation conviction against C. C., as the jury was authorized to conclude that such touching was made with the intent to arouse Ayers.[4]

---

[3] OCGA § 16-6-4 (a).

[4] See *Walsh v. State*, 236 Ga. App. 558, 562 (4) (512 SE2d 408) (1999) (touching child's genital area through his or her clothing constitutes child molestation); *Bragg v. State*, 217 Ga. App. 342, 343 (2) (457 SE2d 262) (1995).

Ayers hog-tied B. P. and B. Z., taped their eyes, tickled them, and fed pudding to them. Ayers inserted a smooth, hard, pudding-covered object — that B. Z. said felt like a finger — into B. Z.'s mouth seven times. B. P. testified that he "heard a zipper," and Ayers then touched his lips with an unknown object. Construing this evidence and inferences therefrom in favor of the verdict, we conclude that a rational trier of fact could have found Ayers guilty of child molestation against B. P. and B. Z. beyond a reasonable doubt.[5]

(b) *Enticing a Child for Indecent Purposes*

Ayers was found guilty of enticing B. Z. and B. P. for indecent purposes. "A person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts."[6] Here, Ayers retrieved the victims from their own homes — after misleading their parents regarding his reason for doing so — and took them to his house, hog-tied them, taped their eyes and mouth, tickled them, and inserted an object into their mouths. Thus, we conclude that the evidence in this case supports the conclusion that Ayers took B. Z. and B. P. to his house with the present intent of either molesting the children or engaging in indecent acts.[7]

(c) *False Imprisonment*

The jury found Ayers guilty of falsely imprisoning M. S. and C. C. Pursuant to OCGA § 16-5-41 (a), "[a] person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority." The evidence that Ayers bound C. C. and M. S. with rope was sufficient for a jury to find that they were illegally detained against their will.[8]

(d) *Kidnapping*

Ayers was found guilty of kidnapping B. P. and B. Z. "A person commits the offense of kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will."[9] "The abduction required by the kidnapping statute need not be accomplished by force — inducement, persuasion

---

[5] See *Slack v. State*, 265 Ga. App. 306, 307 (1) (593 SE2d 664) (2004); *Walsh*, supra; *Stroeining v. State*, 226 Ga. App. 410, 411-412 (1) (486 SE2d 670) (1997) (focus is on adult's actions toward child in relation to adult's motive).

[6] OCGA § 16-6-5 (a).

[7] See *Carolina v. State*, 276 Ga. App. 298, 300-301 (1) (a) (623 SE2d 151) (2005); *Leaptrot v. State*, 272 Ga. App. 587, 590 (1) (b) (i) (612 SE2d 887) (2005).

[8] See *Bills v. State*, 283 Ga. App. 660, 662 (1) (b) (642 SE2d 352) (2007).

[9] OCGA § 16-5-40 (a).

or fraud is sufficient to prove abduction."[10] Here, Ayers persuaded the victims' parents that he was going to get his own children from school and then take all of the children — including the victims — back to his house to play. Instead, Ayers took the victims to his house, while no one else was there, tied them, and tickled them. Thus, his actions in deceiving the parents to give their permission and in inducing the boys to go with him constituted an abduction within the meaning of the kidnapping statute.[11]

The State was also required to prove unlawful asportation of the boys against their will.[12] "[A]n abduction or taking by inducement, persuasion, or fraud can also support a finding of asportation."[13] Thus, Ayers's actions in taking the victims from their own homes to his own, by inducing the victims and their parents, constituted asportation.[14]

Finally, we reject Ayers's argument that the victims were not held against their will. It is not necessary that a kidnapping victim testify that he was held involuntarily, "since other evidence can be [used] to establish the victim was abducted and held against [his] will."[15] Here, Ayers tied both B. P. and B. Z.'s arms and legs with rope and put tape over their mouths, thereby depriving them of the ability to voice opposition to remaining with Ayers. And while his mouth was untaped, B. Z. told Ayers to stop tickling him and demanded that he stop feeding him pudding. B. P. testified that he tried to escape his bindings, but was unable to do so. "This evidence was sufficient so that a rational trier of fact could find beyond a reasonable doubt that the victim[s] [were] abducted and held against [their] will."[16]

2. Nevertheless, we must reverse because the trial court erred in denying Ayers's request to have both of his attorneys present closing argument on his behalf. Our Supreme Court has unequivocally stated that it is error to refuse to allow two attorneys to present middle closing argument on behalf of the defendant.[17] And we cannot conclude that the trial court's denial of Ayers's request in this case was harmless. The Supreme Court has cautioned that

---

[10] *Pickett v. State*, 271 Ga. App. 250, 252 (1) (609 SE2d 181) (2005).

[11] See id. (falsely inducing a child to enter defendant's truck by telling him he would pay child to work for him constituted abduction).

[12] See OCGA § 16-5-40 (a); *Squires v. State*, 265 Ga. App. 673, 675 (1) (595 SE2d 547) (2004).

[13] (Punctuation omitted.) *Leppla v. State*, 277 Ga. App. 804, 807 (1) (627 SE2d 794) (2006); see also *Fredrick v. State*, 181 Ga. App. 600, 601 (1) (353 SE2d 41) (1987).

[14] See id.

[15] *Strozier v. State*, 156 Ga. App. 241 (274 SE2d 633) (1980).

[16] See id.

[17] See *Sheriff v. State*, 277 Ga. 182, 187-188 (2) (587 SE2d 27) (2003).

[t]he right to make a closing argument to the jury is an important one, and abridgment of this right is not to be tolerated. Harm requiring that a defendant be given a new trial is presumed when the right is erroneously denied, and the presumption of harm, though not absolute, is not readily overcome. The presumption of harm may fall when the denial of the right is not complete and *only in those extreme cases in which the evidence of a defendant's guilt is so overwhelming that it renders any other version of events virtually without belief.*[18]

As set forth in Division 1, there was sufficient evidence of the crimes of which Ayers was convicted. But we cannot conclude that the evidence of his guilt was so overwhelming that it demanded a guilty verdict.[19] Certainly, as set forth in the extensive factual recitation in Judge Bernes's dissent, there was overwhelming evidence — including Ayers's testimony at trial — that he bound and tickled the victims. However, it does not automatically follow that this evidence equates with Ayers's guilt for the crimes charged.

Ayers was primarily charged with sex offenses. The only evidence that Ayers's actions were sexually motivated was the bondage images obtained from the computer in Ayers's house — which was clearly circumstantial — and C. C.'s testimony that Ayers touched C. C.'s "privates" over his clothes. None of the three remaining victims stated or even intimated that Ayers's actions were sexual in nature. Indeed, under the highly unusual facts of this case, it does not appear that the children were even aware that they had been victimized by Ayers. While this fact is not essential to a finding of guilt, it is reflective of the highly circumstantial nature of the evidence offered by the State. Although the jury was authorized to infer that Ayers's actions were sexually motivated, we simply cannot say such evidence was overwhelming.[20]

---

[18] (Punctuation omitted; emphasis supplied.) Id. at 188 (3).

[19] See id. at 189.

[20] The evidence submitted in support of Ayers's convictions for kidnapping and false imprisonment was even less compelling than that for the molestation and enticement charges. We addressed the sufficiency of the evidence as to the kidnapping and false imprisonment charges in Division 1, detailing the evidence submitted by the State for each. The kidnapping and false imprisonment charges were essentially premised upon the State's theory that Ayers's actions were sexually motivated. And we have concluded that the sexual charges against Ayers were not supported by overwhelming evidence. Moreover, although the jury was authorized to find Ayers guilty of kidnapping and false imprisonment, given the unique circumstances of this case, we cannot conclude that there was overwhelming evidence that the children were held without legal authority or against their will.

Contrary to Judge Bernes's assertion, we are not ignoring the evidence. Indeed, the facts cited in her dissent are contained in the majority analysis in which we conclude that the jury was authorized to find Ayers guilty. Here, however, it seems that, in her dissent, Judge Bernes crosses the line and improperly weighs the evidence. It is abundantly clear that she rejects Ayers's testimony, finding him to be incredible as a witness. For example, Judge Bernes's dissent refers to "Ayers's implausible trial testimony" and "the credible testimony of all three children, their parents, and the two investigating officers," and concludes that "there is no innocent explanation" for Ayers's conduct. But "[m]atters of witness credibility are within the purview of the factfinder. The obligation to weigh the evidence and to determine witness credibility rests [exclusively] with the factfinder. This court considers only the sufficiency of the evidence."[21]

Overwhelming circumstances do not necessarily equate with overwhelming circumstantial evidence of guilt, although they may in certain instances. We are mindful of the distasteful and egregious nature of the charges against Ayers and well aware of the ramifications of reversing Ayers's convictions. Nevertheless, we are constrained to follow the law as set forth by our Supreme Court. Thus, based upon the unique factual circumstances of this case, and pursuant to the Supreme Court's mandate set forth in *Sheriff v. State*, we are required to reverse Ayers's convictions and remand the case to the trial court for a new trial.

3. Based upon our holding in Division 1, we need not address Ayers's remaining enumerations. However, because we conclude that the issue of the admissibility of the sexually explicit material recovered from Ayers's computer is likely to recur upon retrial, we will address this enumeration.[22]

Ayers asserts that the trial court erred in admitting the evidence depicting adult male and female bondage because it did not show acts involving children. In *Simpson v. State*, our Supreme Court held that

[i]n a prosecution for a sexual offense, evidence of sexual paraphernalia found in defendant's possession is inadmissible unless it shows defendant's lustful disposition toward the sexual activity with which he is charged or his bent of mind to engage in that activity. Under this rule, sexually explicit material cannot be introduced merely to show a

---

[21] (Punctuation omitted.) *Melvin v. State*, 225 Ga. App. 169, 171 (1) (483 SE2d 146) (1997).
[22] See *Warner v. State*, 277 Ga. App. 421, 423 (2) (626 SE2d 620) (2006).

defendant's interest in sexual activity. It can only be admitted if it can be linked to the crime charged.[23]

Here, the explicit materials did not just show Ayers's lustful disposition toward sexual activity in general. Instead, the materials depicted men and women engaged in bondage, most of whom were tied with rope and/or had their mouths gagged or covered. Each of the four victims in this case testified that Ayers restrained them with rope, C. C. and B. Z. stated that Ayers taped their mouths, and C. C., B. Z., and B. P. testified that Ayers placed tape over their eyes. Moreover, C. C. testified that there was a video camera pointed toward him and that he saw an image on Ayers's computer of a person that had been restrained in some way. Thus, the computer images "showed [Ayers's] lustful disposition toward a particular sexual activity and his bent of mind to engage in that activity."[24]

Contrary to Ayers's argument, the fact that the images did not depict minors does not render them inadmissible.[25] And Ayers's contention that the materials were inadmissible because "[t]he only evidence of [his] intent to behave sexually under any circumstances relates to the pornography found on his computer" is equally unpersuasive, particularly given C. C.'s testimony that Ayers touched his "privates." Accordingly, we conclude that the trial court did not abuse its discretion in admitting the images recovered from Ayers's computer and that this argument, as enumerated, presents no basis for reversal.[26]

*Judgment reversed and case remanded. Barnes, C. J., Andrews, P. J., and Blackburn, P. J., concur. Smith, P. J., and Miller and Bernes, JJ., concur in part and dissent in part.*

SMITH, Presiding Judge, concurring in part and dissenting in part.

I concur in Divisions 1 and 3 of the majority, and with the conclusion that the trial court erred in Division 2. I respectfully dissent because that error does not require reversal. Overwhelming evidence supports the defendant's convictions for child molestation, enticing a child for indecent purposes, kidnapping, and false imprisonment. This is not a case involving a swearing contest between one victim and an accused. Multiple victims testified to startlingly similar conduct by the defendant and the sexually graphic computer images provide independent and overwhelming tangible evidence of

---

[23] 271 Ga. 772, 774 (1) (523 SE2d 320) (1999).

[24] *Mooney v. State*, 266 Ga. App. 587, 590 (2) (597 SE2d 589) (2004).

[25] See id.

[26] See id.; *Summage v. State*, 248 Ga. App. 559, 561-562 (2) (546 SE2d 910) (2001).

Ayers's intent with regard to the sexual offenses. See *Blige v. State*, 264 Ga. 166, 168 (3) (441 SE2d 752) (1994) (evidence of similar transactions supported finding that evidence was overwhelming, rendering trial court's error harmless). Additionally, two of the victims, who did not know one another, made independent reports to the police on the same day.

Because both the majority and dissent focus on whether overwhelming evidence of sexual intent existed, this dissent will focus on that issue as well. OCGA § 16-6-4 (a) defines child molestation as "any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person." Id.

> Immoral or indecent acts constituting child molestation refer to acts generally viewed as morally indelicate or improper or offensive and acts which offend against the public's sense of propriety. . . . [T]he Georgia law against child molestation affords protection to a child's body in those cases where the act or acts are more suggestive of sexually oriented misconduct than simply assaultive in nature.

(Citations and punctuation omitted.) *Wormley v. State*, 255 Ga. App. 347, 348 (565 SE2d 530) (2002). In this case, the defendant's conduct in tying the children up and gagging their mouths in a way similar to numerous sexually explicit images on his home computer provides overwhelming evidence that he did so with the "intent to arouse or satisfy" his sexual desires. Particularly telling is the evidence that one child, while he was bound, saw on Ayers's computer an image of someone who was also bound. Since the crime of child molestation was complete when Ayers tied the children up to arouse his sexual desires, the conflict in the evidence about what he did with the children *after* he tied them up and blindfolded them is immaterial and does not render the evidence less than overwhelming.

The computer images also provide overwhelming evidence that Ayers enticed the children for indecent purposes, a crime that was complete when he obtained permission from their parents under false pretenses and took them to his home for the purpose of arousing his sexual desires. See OCGA § 16-6-5 (a).

In support of its conclusion that overwhelming evidence of guilt is lacking in this case, the majority, without citation to authority, asserts that "[o]verwhelming circumstances do not necessarily equate with overwhelming circumstantial evidence of guilt, although it may in certain instances." Overwhelming evidence or "circumstances" is overwhelming evidence, however, whether it be direct or circumstantial, and provides overwhelming evidence of guilt. Cf. *Collum v. State*,

281 Ga. 719, 722 (2) (642 SE2d 640) (2007) (overwhelming circumstantial evidence of guilt rendered trial court's error harmless); *Chews v. State*, 187 Ga. App. 600, 603 (1) (371 SE2d 124) (1988) (full concurrence in Division 1) ("circumstantial evidence of defendant's guilt was overwhelming").

Because overwhelming evidence of Ayers's guilt exists, we should affirm his convictions.

BERNES, Judge, concurring in part and dissenting in part.

I concur in Divisions 1 and 3 of the majority opinion, and with the majority's conclusion that the trial court erred in denying Ayers's request to have his second counsel make an additional closing argument on his behalf. But, because the evidence of Ayers's guilt was so overwhelming that it renders any other version of events virtually without belief, I respectfully dissent from the reversal of Ayers's multiple convictions centered on the hog-tying, blindfolding, and touching of the three young boys B. Z., B. P., and C. C. in a manner consistent with the myriad images of bondage pornography found on his home computer.[27]

The evidence at trial reflects that the bizarre circumstances of this case were initially related and reported separately by two different children, B. Z. and B. P. As the majority notes, both children reported to their respective parents that Ayers had hog-tied them, taped their eyes, and touched them. More specifically, immediately after Ayers brought him home, and in front of Ayers, B. Z. asked his mother to "tell Mr. Ayers never to tape my eyes and my mouth shut again." The following day, B. Z.'s mother overheard a statement from B. Z.'s friend, C. C., that he "didn't like Mr. Ayers tickling [him], either." B. Z. later told his parents that Ayers had tied him up and taped his eyes and mouth shut. Likewise, when Ayers took B. P. home, his father inquired about red marks across his eyes. B. P. described how Ayers tied him up, taped his eyes, fed him pudding, and attempted to stick something in his mouth.

The families of B. Z. and B. P., who did not know each other, then independently called two separate agencies on the same day and related virtually identical allegations against Ayers. Moreover, both families alleged that Ayers initiated contact with them, arranged to pick up the children under the auspices of a play date, took the children to his house where no one else was present, and then performed the acts detailed in the majority opinion.

---

[27] Ayers also was convicted of the false imprisonment of a fourth child, M. S., but I agree with the majority that the evidence of that particular offense, with respect to that particular child, was not overwhelming.

The allegations of B. Z. and B. P. were consistent with the allegations of C. C., who testified that while Ayers was alone with him, Ayers tied him up with his feet and hands behind his back, put tape over his mouth and eyes, and began touching him. In turn, the allegations of all three child victims were consistent with, and were corroborated by, the physical evidence found by police. In Ayers's bedroom near his bed, where B. Z. and B. P. alleged that the crimes occurred, the officers found a bag containing white rope and a role of duct tape. B. Z. and B. P. identified the rope and the tape as the ones used in the transgressions against them. In the trash outside, an officer found an empty container of chocolate pudding in close proximity to a wadded up ball of used duct tape.

Most significantly, the officers found over 1,300 images of pornography on Ayers's computer, the vast majority of which involved bondage. These images included countless pictures of males that had been hog-tied and gagged in the manner described by the children, taken from sites such as "bound & gagged," "hogtied," "hogtied bondage," and "teenboy's pics." The computer was located in Ayers's bedroom, in close proximity to his bed.

Finally, on the night of his arrest, Ayers himself essentially admitted perpetrating the acts alleged by B. Z., B. P., and C. C. During the initial interview at his home and subsequent interview at the police station, Ayers admitted to having tied up B. Z., B. P., and C. C. during the month of July. In particular, he admitted that he had "hog-tied" and tickled B. Z. in his bedroom using rope from his computer desk, and admitted putting tape on his face. He also admitted that he had taken B. P. to his house alone, fed him pudding, and later tied him up. And he admitted that he "hog-tied" and tickled C. C. in his living room using white rope, after having invited C. C. over despite the absence of his children.

To discount this damning evidence, Ayers presented a version of events at trial that requires this Court to disregard the credible testimony of all three children, their parents, and the two investigating officers who interviewed Ayers incident to his arrest. To believe Ayers's story we must ignore physical evidence, such as the white rope that, according to Ayers, the children had no reason to know existed. And, we must deem it a coincidence that Ayers's computer was replete with images of bondage consistent with that of the children's accounts, and believe that the children, their families, and law enforcement conspired to frame Ayers for reasons unknown and otherwise completely unexplained.

Indeed, Ayers himself apparently believed that a conspiracy theory was necessary in order explain how and why B. Z. and B. P., who did not know each other, would make up virtually similar allegations that also were consistent with the allegations of C. C. At

trial, Ayers claimed that on his way to B. P.'s house, he ran into B. Z.'s mother in the parking lot of a drugstore. B. Z.'s mother apparently wanted "to go somewhere and talk" and said that if he did not, he would "regret it." Ayers said that he explained to B. Z.'s mother that he could not talk because he had to go pick up B. P. for a play date at his house. B. P. apparently lived in a house that had been converted to apartments located near the drugstore. Ayers claimed that he physically pointed to the house and told B. Z.'s mother that B. P. lived in an apartment on the back side of the house and that was where he was headed, implying that B. Z.'s mother must have later gone to the house and conspired with B. P. and his parents to falsely accuse Ayers of the alleged crimes.

Sometimes, a defendant simply digs a deeper hole for himself through his testimony at trial. That is the case here. Ayers's trial testimony should not be seized upon as a basis for reversal of his multiple convictions. Under these circumstances, where the acts allegedly perpetrated were bizarre in nature but nevertheless were initially related and reported separately by two different children who did not know one another, were corroborated by physical evidence taken from the defendant's home, and were essentially admitted to by the defendant in his first encounter with law enforcement, I believe that the evidence of guilt was overwhelming, and was not made less so by Ayers's implausible trial testimony.[28]

The majority agrees that there was overwhelming evidence that Ayers's bound and tickled the victims, but opines that the evidence of Ayers's sexual intent was not overwhelming because it was "clearly circumstantial."[29] This is simply wrong. Circumstantial evidence can be, and in this case is, overwhelming. See, e.g., *Collum v. State*, 281 Ga. 719, 722 (2) (642 SE2d 640) (2007). As noted, the State presented evidence of Ayers's extensive library of bondage pornography, which included multiple poses and images remarkably similar to the children's descriptions of what occurred in this case, which constituted extremely strong evidence of sexual motivation. And, candidly, there is no innocent explanation for an adult male in his mid-thirties

---

[28] The majority accuses the dissent of improperly weighing the evidence. While it is true that we are not to weigh the evidence or assess witness credibility in determining the sufficiency of the evidence, any harmless error analysis inexorably leads to an evaluation of the strength of the evidence. See *Dixon v. State*, 173 Ga. App. 280, 282 (325 SE2d 893) (1985) (noting that once this Court determines that error was committed at trial, "the evidence is examined to determine" whether the error was harmless).

[29] The majority finds it significant that the minor child victims were not aware that Ayers's conduct was sexual. But, even when the most blatant sexual acts are perpetrated upon young children, the children may not have the awareness or the ability to describe the conduct as sexual. As such, the victims' lack of subjective awareness is of little import to the analysis under the circumstances of this case.

spending time alone with young boys, hog-tying them, taping their eyes and mouths, tickling them, and placing pudding-covered, unidentified hard objects in their mouths. This cannot reasonably be explained away as mere horseplay or fun-and-games.

For these reasons, I believe that the harmless error standard set forth in *Sheriff v. State*, 277 Ga. 182, 188 (3) (587 SE2d 27) (2003) has been met. Ayers's convictions for the offenses committed against B. Z., B. P., and C. C. should be affirmed.

I am authorized to state that Judge Miller joins in this opinion.

DECIDED JULY 16, 2007 —
RECONSIDERATION DENIED JULY 31, 2007 —

*Gordon & Brown, Gerald W. Brown*, for appellant.
*Robert W. Lavender, District Attorney, Leon Jourolmon, Assistant District Attorney*, for appellee.